UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Joseph Walbridge, Individually
and on Behalf of All Others
Similarly Situated

      v.                            Civil No. 17-cv-434-JD
                                    Opinion No. 2018 DNH 044
Northeast Credit Union
and Does 1 through 100


O R D E R

Joseph Walbridge brings a putative class action to challenge the practices of Northeast Credit Union to charge overdraft fees when customers' accounts held funds to cover the transactions. He alleges claims for breach of contract, breach of the implied duty of good faith and fair dealing, unjust enrichment, money had and received, and violation of Regulation E, 12 C.F.R. § 1005.17, of the Electronic Fund Transfers Act ("EFTA"), 15 U.S.C. § 1693, et seq. Northeast moves to dismiss all claims.

Standard of Review

In considering a motion to dismiss, the court accepts all well-pleaded facts as true, disregarding legal conclusions, and resolves reasonable inferences in the plaintiff's favor. Galvin v. U.S. Bank, N.A., 852 F.3d 146, 155 (1st Cir. 2017). To avoid

dismissal, the complaint must state sufficient facts to support a plausible claim for relief. In re Curran, 855 F.3d 19, 25 (1st Cir. 2017). The plausibility standard is satisfied if the factual allegations in the complaint, along with reasonable inferences, show more than a mere possibility of liability. Germanowski v. Harris, 854 F.3d 68, 71 (1st Cir. 2017).

## Background

Walbridge had a checking account and a debit card with Northeast Credit Union that was originated by the Share Account Agreement ("Account Agreement"). Walbridge also completed the Opt In Form for overdraft transactions ("Opt In Agreement"). His claims in this case arise from overdraft fees charged by Northeast based on the "available balance" in his account rather than the balance shown on the account, called the "ledger balance" or "actual balance."

The difference between the available balance and the actual balance results from the way Northeast credits deposits made to an account and reduces the balance by debits that are pending but not yet paid. As a result, the available balance can be less, and even considerably less, than the actual balance, depending on the delay in crediting deposits and the anticipatory deductions of pending debits. Northeast then assesses an overdraft fee when the available balance is

insufficient to cover a transaction, even though the actual balance shows enough money to cover the transaction.[1]

Walbridge alleges that on March 15, 2016, he had an actual balance in his Northeast checking account of $111.09. He made a debit card payment of $32.43, which left a balance of $78.66. Northeast, however, determined that he had insufficient funds and charged an overdraft fee of $32.00. Northeast then assessed additional overdraft fees of $32.00 on March 29 and March 30, 2016. Walbridge believes that subsequent improper overdraft fees were charged but provides no allegations in support.

Walbridge alleges that Northeast breached the Account and Opt In Agreements and the implied duty of good faith and fair dealing by charging him overdraft fees when the actual balance showed there was money in his account to cover the transactions. He also brings equitable claims for unjust enrichment and money had and received. In addition, Walbridge alleges that Northeast violated Regulation E of EFTA by failing to disclose its overdraft policy.

---

[1] See Smith v. Bank of Hawaii, 2017 WL 3597522, at *1 (D. Haw. Apr. 13, 2017) (explaining the overdraft practice); see also In re TD Bank Debit Card Overdraft Fee Litig., --- F. Supp. 3d ---, 2018 WL 1003548, at *2-*3 (D.S.C. Feb. 22, 2018) (explaining the purpose of the policy of anticipatory deduction of pending transactions in order to increase incidents of overdraft fees).

Discussion

Northeast moves to dismiss Walbridge's breach of contract claims and EFTA claim on the grounds that it did not promise to use the actual balance for its overdraft service and instead properly explained its overdraft policy based on the available balance. Northeast moves to dismiss the EFTA claim on the merits and asserts that the claim is barred by the statute of limitations and the "safe harbor" provision. Northeast moves to dismiss the equitable claims because valid contracts control the issues raised. Walbridge objects to the motion to dismiss.

## A. Breach of Contract

Walbridge contends that Northeast breached the Opt In Agreement by assessing overdraft fees when there was enough money in his account to cover the transaction. He contends that Northeast breached the Account Agreement because it promised to assess overdraft fees only when there were insufficient funds in the account to cover a transaction but instead assessed overdraft fees based on the available balance. Northeast asserts that no breach occurred.

Under New Hampshire law, "[a] breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." Audette v. Cummings, 165 N.H. 763, 767 (2013) (internal quotation marks

4

omitted).  The meaning of a written contract is a question of law for the court.  [Holloway Auto. Gr. v. Giacalone, 169 N.H. 623, 628 (2017)](#).  "When interpreting a written agreement, [the court gives] the language used by the parties its reasonable meaning, reading the document as a whole, and considering the circumstances and the context in which the agreement was negotiated."  Id.

"The language of a contract is ambiguous if the parties to the contract could reasonably disagree as to the meaning of that language."  [Found. for Seacoast Health v. Hosp. Corp. of Am., 165 N.H. 168, 172 (2013)](#) (internal quotation marks omitted).  To determine whether an ambiguity exists, the "court should examine the contract as a whole, the circumstances surrounding execution and the object intended by the agreement, while keeping in mind the goal of giving effect to the intentions of the parties."  Id.  The process of applying that standard generally involves factual issues although in some cases an ambiguity may be resolved as a matter of law.  [Sunapee Difference, LLC v. State, 164 N.H. 778, 790 (2013)](#).

### 1.  Opt In Agreement

The Opt In Agreement is a one-page form through which a Northeast customer chooses to have certain overdrafts paid by

Northeast and to incur a fee for that service.[2]  The Agreement
states:  "An overdraft occurs when you do not have enough money
in your account to cover a transaction, but we pay it anyway."
The Agreement continues on to explain that there are two kinds
of protection:  standard practices for protection as part of the
Northeast account and other overdraft protection plans that
would link with another account.  The Opt In Agreement pertains
to the standard practices.  The Agreement does not define or
explain what is meant by the phrase:  "when you do not have
enough money in your account to cover a transaction."

     Walbridge argues that the plain meaning of the promise in
the Opt In Agreement is that an overdraft would occur only when
there was not enough money in the account, as shown by the
actual balance, to cover the transaction.  Northeast argues that
the Opt In Agreement is part of the Account Agreement and must
be read in conjunction with that Agreement.  Based on reading
the Agreements together, Northeast contends that the plain
meaning of "enough money" is the available balance.

     Standing alone, the Opt In Agreement does not sufficiently
define or explain the term "enough money" to put account holders

---

     [2] In 2010, Regulation E of the EFTA was amended to require
financial institutions to obtain consent from customers before
enrolling them in overdraft services that would incur fees.  In
re TD Bank, 2018 WL 1003548, at *6.

on notice that "enough money" means the available balance.  Cf. Chambers v. NASA Fed. Credit Union, 222 F. Supp. 3d 1, 10 (D.D.C. 2016) (opt in agreement provided examples to show what "not enough money in your account" meant).  The Opt In Agreement also does not specifically reference the Account Agreement.

On the other hand, there would be no need for overdraft protection, provided in the Opt In Agreement, in the absence of an account at Northeast that is established through an Account Agreement.  The Account Agreement refers to the Opt In Agreement as the source for certain overdraft protections.[3]  Although the Agreements are separate, they are arguably linked with respect to an account holder's overdraft protection.  See Smith, 2017 WL 3597522, at *5.  For purposes of the current motion to dismiss, the court will consider the promise made in the Opt In Agreement in the context of the Account Agreement.

2.  Account Agreement

The Account Agreement includes several sections pertaining to available funds and overdrafts.  Section 3.7 explains that Northeast can refuse to allow a withdrawal "if the amount

---

[3] The copies of the documents provided here are not signed or dated, which leaves a factual question as to when the agreements were signed and in what sequence.  Cf. Tims v. LGE Community Credit Union, 2017 WL 5133230, at *3 (N.D. Ga. Nov. 6, 2017) (holding that the agreements should be read together because they were signed at the same time as part of opening an account).

requested is not yet available for withdrawal." Doc. 8-4 at 3.

Section 3.10, titled "Nonsufficient Funds," states: "If you

write a check for more money than you have in your account, you

will be deemed to be overdrawn and [Northeast] may refuse to

honor the check and return it as unpaid for reason of

nonsufficient funds (NSF)." Id. at 4. Neither section defines

"available for withdrawal" or "more money than you have in your

account."

More specific to overdrafts, section 3.35, titled "Paying

of Overdrafts," states that "at its sole discretion, [Northeast]

may honor items presented for payment or authorization against

your account even if there are insufficient funds in your

account." Id. at 6. The provision explains what items may and

may not be honored and that a fee will be charged when payments

are made. The remainder of the provision provides the process

of notification, consequences for failure to correct a "negative

balance," and the procedures for collecting amounts owed. The

term "insufficient funds" is not defined.

Appended to the Account Agreement is another document

titled "Northeast Credit Union Combined Disclosure Agreement."

One of the six parts of the Disclosure Agreement is titled

"Truth-in-Savings Disclosure for Personal Savings & Transaction

Accounts," which includes a provision titled "Funds Availability Policy for Personal and Business Accounts."  Doc. 8-4, at 10.

The Funds Availability Policy explains when deposits become available for use and that not all deposited funds are available for withdrawal or to pay checks as soon as they are deposited. There does not appear to be any reference in that provision to the overdraft payment section of the Account Agreement or to the overdraft protection offered in the Opt In Agreement.  Neither the Account Agreement nor the Opt In Agreement refers customers to the Disclosure Agreement to find definitions or explanations of what balance is used for purposes of overdraft protection.

Northeast contends that that the cited parts of the Account Agreement and the Disclosure Agreement make it clear that the terms "insufficient funds" and "enough money" mean available funds and that the Funds Availability Policy in the Disclosure Agreement explains that deposits are not always immediately available for use.  Walbridge contends that the terms used plainly mean the actual balance and that Northeast's references to other provisions in the Account Agreement and the Disclosure Agreement do not show that a reasonable person would have understood those terms meant available balance.  Walbridge also notes that nothing in the Account Agreement or the Disclosure Agreement explains Northeast's policy of reducing the actual

balance by pending debits, which can result in an even lower available balance for purposes of determining when overdrafts occur.[4]

Other courts have considered similar breach of contract claims arising from financial institutions' practices of charging overdraft fees based on available balances and have come to differing conclusions. Northeast relies on Tims v. LGE Community Credit Union, 2017 WL 5133230 (N.D. Ga. Nov. 6, 2017), and Chambers v. NASA Fed. Credit Union, 222 F. Supp. 3d 1 (D.D.C. 2016). In Tims, the court found that references to the availability of deposited funds in a section of the Account Agreement titled "Payment Order of Your Transactions" and in the Disclosure Agreement to conclude that "the parties intended 'sufficient' and 'enough' to mean the available balance method."[5] Tims, 2017 WL 5133230, at *4.

In Chambers, the parties disputed whether the language in the Opt In Agreement promised to use the actual balance or the available balance for assessing an overdraft. 222 F. Supp. 3d at 10. There, the court found that the opening paragraph of the

_____

[4] Neither party explains what caused the difference between the actual balance and the available balance in Walbridge's account.

[5] Northeast does not cite a provision in this Account Agreement for "Payment Order of Your Transactions."

Opt In Agreement provided examples to explain when an account did not have "enough money" and used the term "available balance" in the explanations.  Id.  The Account Agreement at issue in that case also included a section that addressed "Available Balances to Make Transactions" that the court found "unambiguously link[ed] overdrafts to the available balance." Id. at 11.  In this case, the Opt In Agreement does not include the examples and explanations that were provided in Chambers nor are there repeated references in the Account Agreement that link overdrafts to available balances or clearly show the parties' intent that the terms used meant available balance.

Walbridge relies on a series of cases in which courts have found that the language used in similar Opt In Agreements and Account Agreements is ambiguous as to what constitutes enough money in the account or sufficient funds for purposes of assessing overdraft fees.  In Smith, the court concluded that the terms used in the Opt In Agreement and Account Agreement to describe the balance used for the overdraft policy were ambiguous and could have referred to either the actual balance or the available balance.[6]  2017 WL 3597522, at 7.  Similarly, in

---

[6] The bank in Smith used the term "available" to describe account balances, but the court found that it did not adequately define "available."  Smith, 2017 WL 3597522, at *7.  "At no point, in either of the Agreements, does BOH define the meaning of 'available' when describing balances.  BOH apparently assumes

Ramirez v. Baxter Credit Union, 2017 WL 1064991, at *5 (N.D. Calif. Mar. 21, 2017), the court found that the Account Agreement did not define "available balance" that the credit union used for assessing overdrafts and found that the term was ambiguous.  See also Roberts v. Capital One, N.A., --- Fed. Appx. ---, 2017 WL 5952720, at *2-*3 (2d Cir. Dec. 1, 2017) (finding term overdraft ambiguous in the absence of a clear explanation of when an overdraft occurs ); Wodja v. Wash. St. Employees Credit Union, 2016 WL 3218832, at *3 (W.D. Wash. June 9, 2016) (denying motion to dismiss because terms used were not clear); Pinkston-Poling v. Advia Credit Union, 227 F. Supp. 3d 848, 854-55 (W.D. Mich. 2016) (finding agreement language that overdraft fee would be charged when the account does not contain sufficient funds or enough money could reasonably mean the actual balance); Gunter v. United Fed. Credit Union, 2016 WL 3457009, at *2-*3 (D. Nev. June 22, 2016) (finding reference to available funds ambiguous in the absence of an explanation as to how an overdraft is determined); In re:  TD Bank, N.A. Debit

_____

that the customer will read the word 'available' in six scattered sections spanning the thirty-six page Account Agreement and come to a conclusion—BOH will use the available balance method when determining overdraft fees.  But this assumes too much.  The word 'available' simply cannot shoulder the weight of all the assumptions BOH seeks to place on it, just as the court cannot expect customers to bear the burden of knowing banking terms of art when BOH never defined them."  Id.

Card Overdraft Fee Litig., 150 F. Supp. 3d 593, 623-24 (D.S.C. 2015) (finding plaintiffs stated a claim for breach of contract by use of the available balance to assess overdraft fees despite reference to available balance in Account Agreement).

In this case, Northeast did not use the term "available balance" as the defendants did in Smith, Ramirez, and Wodja and instead referred to "enough money," "insufficient funds," and "nonsufficient funds."  To the extent the availability of funds is explained in the Disclosure Agreement, that section was not linked to the Opt In Agreement or to the parts of the Account Agreement that discussed overdrafts.  In addition, as the court noted in Smith, the agreements here are long, twenty-four pages in total, and Northeast relies on scattered references to available funds while using other terms that it does not define. The terms Northeast used, in the absence of clear definitions or explanations, could reasonably be understood to mean the actual balance, as other courts have found.[7]

---

[7] Northeast contends that the term "enough money" is sufficient and means available balance because Regulation E defines an "overdraft service" to mean "'a service under which a financial institution assesses a fee or charge on a consumer's account held by the institution for paying a transaction (including a check or other item) when the consumer has insufficient or unavailable funds in the account.'"  Doc. no. 8-1 at 12 (quoting "Regulation E Final Rule, 74 F.R. 59033-01 (Nov. 17, 2009)).  Northeast does not show that the Final Rule definition of overdraft service is included in either Agreement, or that the definition in the Rule clarifies Northeast's promise

Northeast has not shown that the only reasonable meaning of "enough money," "insufficient funds," and "nonsufficient funds" is the available balance. The Account Agreement and the Opt In Agreement could be reasonably understood to promise that overdraft fees would be charged only if a customer overdrew the actual balance in the account. Therefore, Walbridge states claims for breach of the Opt In and the Account Agreements.

B.   <u>Breach of the Implied Duty of Good Faith and Fair Dealing</u>

Northeast moves to dismiss the implied duty claim on the ground that it is premised on erroneous interpretations of the Opt In Agreement and the Account Agreement. Based on its own interpretations of the Agreements, Northeast asserts that its overdraft fee policy did not breach the implied duty. As is explained above, Northeast has not shown that the Agreements promised to charge overdrafts based on the available balance. For that reason, Northeast has also not shown that Walbridge fails to state a claim for breach of the implied duty.

---

in the Opt In Agreement. To the extent Northeast also relies on results of testing done by a consulting company for the Federal Reserve Board to create a model opt in form, that process does not show that the terms used in the Opt In Agreement and Account Agreement were clear and unambiguous.

C.  Unjust Enrichment and Money Had and Received

Northeast moves to dismiss the equitable claims for unjust enrichment and money had and received on the ground that those claims cannot succeed when a contract controls the issue raised in the claims.  In response, Walbridge contends that he can plead causes of action in the alternative.  He also argues that his claim for money had and received is not affected by the Agreements because he was not contractually required to pay the overdraft fees.

"Unjust enrichment is an equitable remedy that is available when an individual receives a benefit which would be unconscionable for him to retain." Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 669 (2013) (internal quotation marks and emphasis omitted).  That is, "a defendant is liable if equity and good conscience requires" liability because "one shall not be allowed to profit or enrich himself at the expense of another contrary to equity." Am. Univ. v. Forbes, 88 N.H. 17, 183 A. 860, 862 (1936); see also Clapp v. Goffstown Sch. Dist., 159 N.H. 206, 210 (2009).  "An action for money had and received is an equitable action, and may, in general, be maintained whenever the defendant has money belonging to the plaintiff which in equity and good conscience he ought to refund to him." Winslow v. Anderson, 76 N.H. 478, 102 A. 310, 311

(1917) (internal quotation marks omitted); see also Lakeport
Nat'l Bank v. McDonald, 80 N.H. 337, 116 A. 638, 640 (1922);
Rollins v. McDonald, 7 F.2d 422, 425 (1st Cir. 1925) (construing
New Hampshire law).  Generally, a claim for money had and
received is construed to have the same elements as a claim for
unjust enrichment, except that it is limited to enrichment by
money.  Jelmoli Holding, Inc. v. Raymond James Fin. Servs.,
Inc., 470 F.3d 14, 17 n.2 (1st Cir. 2006).

     While a plaintiff cannot recover under both breach of
contract and the equitable actions for unjust enrichment or
money had and received, the existence of a contractual
relationship does not necessarily require dismissal of an
equitable claim at the pleading stage.  See Lass v. Bank of Am.,
N.A., 695 F.3d 129, 140 (1st Cir. 2012).  On the other hand,
however, a claim for "unjust enrichment may not supplant the
terms of an agreement."  Axenics, 164 N.H. at 669.  A claim for
unjust enrichment may be available to contracting parties but
only when "the benefit received is outside the scope of the
contract."  Id. at 670.

     Walbridge does not dispute the validity of the Agreements
and brings claims for breach based on the same theory that he
asserts in support of his equitable claims.  As such, Walbridge
does not allege that the fees charged by Northeast are outside

the scope of the Agreements.  Although incompatible claims might be allowed to proceed at the pleading stage in some cases, here Walbridge could not recover on his equitable claims, which arise out of the Agreements, and therefore, it is appropriate to dismiss the claims.

D.  EFTA, Regulation E

Walbridge alleges that Northeast violated Regulation E of EFTA, 12 C.F.R. § 1005.17, by not accurately describing Northeast's overdraft service in the Opt In Agreement. Northeast moves to dismiss the claim on the grounds that it did not violate Regulation E, citing 12 C.F.R. 205.17, that Northeast is protected by the safe harbor provided by 12 C.F.R. § 205.4, and that that the claim is untimely.[8]

Regulation E implements EFTA and requires financial institutions to provide notice and obtain the consent of their account holders before charging overdraft fees for certain transactions.  § 1005.17(b).  The notice must "be substantially

_____

[8] Northeast does not explain why it cites to Part 205 rather than Part 1005 or point out any substantive difference between § 205.17 and § 1005.17, which are both referred to as Regulation E and appear to be substantially the same or identical.  See Tims 2017 WL 5133230, at *6, n.55.  Both are titled "Requirements for overdraft services."  Part 205 is in Chapter II of Title 12, Subchapter A.- Board of Governors of the Federal Reserve System, while Part 1005 is in Chapter X-Bureau of Consumer Financial Protection.  Because Walbridge alleges that the claim is based on § 1005.17, the court will use Part 1005.

similar to Model Form A-9 set forth in Appendix A of this part, include all applicable items in this paragraph, and may not contain any information not specified in or otherwise permitted by this paragraph." § 1005.17(d). Paragraph d requires "[a] brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions." § 1005.17(d)(1).

1. Violation

Walbridge alleges that Northeast violated Regulation E by failing to include an accurate description of its overdraft service in the Opt In Agreement as required by § 1005.17(d)(1), which resulted in a failure to provide notice before charging a fee for an overdraft. Northeast contends that it did not violate Regulation E because the phrase "not enough money" used in the Opt In Agreement to describe when an overdraft would occur is an accurate description of its overdraft service. Northeast also asserts that it did not violate Regulation E because it used the model form without any alteration.

To the extent Northeast moves to dismiss the Regulation E claim on the ground that it used Model Form A-9, that argument merely frames the question of whether Northeast used the overdraft method that is described in its Opt In Agreement. In

other words, does "enough money" as used in Model Form A-9 and the Opt In Agreement mean the available balance, as Northeast argues, or the actual balance, as Walbridge argues. As is discussed above in the context of the breach of contract claim, the phrase could mean either and is therefore ambiguous. See Smith, 2017 WL 3597522, at *7. If "enough money" means the actual balance, as Walbridge claims, Northeast violated Regulation E by failing to accurately describe its overdraft service, which charged fees for an overdraft based on the available balance.

Northeast suggests that it could not describe its overdraft policy differently because that is not allowed under Regulation E. Other courts have concluded that financial institutions are required by Regulation E to accurately describe their overdraft services and that additional explanation is allowed, if necessary, because an Opt In Agreement need only be substantially similar to Form A-9. Gunter, 2017 WL 4274196, at *3; Pinkston-Poling v. Advia Credit Union, 2017 WL 5153218, at *2 (W.D. Mich. Apr. 20, 2017); Smith, 2017 WL 3597522, at *8; Ramirez, 2017 WL 118859, at *7-*8. Walbridge has adequately alleged a violation of Regulation E.

2.  <u>Defenses</u>

Northeast contends that it is protected from liability for any violation of Regulation E by EFTA's safe harbor provision and by EFTA's statute of limitations.  Walbridge contends that neither applies.

a.  <u>Safe Harbor</u>

Financial institutions are protected from liability under EFTA, 15 U.S.C. § 1693m, for "any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or the Board."  § 1693m(d)(2). With only one cited exception, the safe harbor provision has been interpreted to protect institutions from liability for violations arising from the form of notice provided but not from inaccurate or misleading content of the notice.  See Gunter, 2017 WL 4274196, at *4; Pinkston-Poling, 2017 WL 5153218, at *2; Smith, 2017 WL 3597522, at *8; Walters v. Target Corp., 2017 WL 3721433, at *5 (S.D. Calif. Feb. 14, 2017); Ramirez, 2017 WL 118859, at *7; Berenson v. Nat'l Fin. Servs., LLC, 403 F. Supp. 2d 133, 151 (D. Mass. 2006); but see Tims, 2017 WL 5133230, at *7 (recognizing that other courts did not apply the safe harbor to claims challenging the accuracy of the Regulation E notice but distinguishing the claim there as challenging "precision" rather than "accuracy").

As is explained in detail in the cited cases, the safe harbor provided by § 1693m(d)(2) does not apply to Walbridge's claim that Northeast violated EFTA by inaccurately describing its overdraft service. The reasoning in <u>Tims</u> is strained at best and, therefore, not persuasive. The safe harbor does not apply to Walbridge's claim in this case.

### b. Statute of Limitations

EFTA claims must be brought "within one year from the date of the occurrence of the violation." § 1693m(g). Walbridge does not allege facts to show when he signed the Opt In Agreement, which he contends violates EFTA. He does allege, however, that he was charged overdraft fees, based on the Opt In Agreement, on three occasions in March of 2016. Because Walbridge filed his complaint on September 20, 2017, it appears that his claim is time barred. Walbridge argues, however, that the limitations period begins anew with each overdraft charge and that the discovery rule applies which raises a factual issue that cannot be resolved in the context of a motion to dismiss.

### i. Independently Actionable Violations

Walbridge contends that a new cause of action for a violation of Regulation E occurred each time Northeast charged

him an overdraft fee.[9]  Although not alleged in the complaint,

Walbridge implies that he was charged overdraft fees within the

limitations period, although none are actually alleged, and that

his claim based on those charges is not time-barred.  Northeast

argues that any additional overdraft fees do not affect the

application of the statute of limitations because the alleged

violation occurred, if at all, when it provided Walbridge an

allegedly inaccurate notice of the overdraft service through the

Opt In Agreement and then charged him a fee based on the

permission granted through the Agreement.

All but one of the courts that have considered the EFTA

statute of limitations have concluded that the limitation period

is triggered when a financial institution makes a first

unauthorized transfer or a fee assessment is paid.  See Wheeler

---

[9] To the extent Walbridge also relies on a theory of continuing violation, that theory does not apply here.  The continuing violation doctrine applies in narrow circumstances, usually in discrimination cases, to allow recovery for actions taken outside the limitations period when repeated conduct is necessary to cause an injury.  Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am., LLC, 794 F.3d 200, 205 (1st Cir. 2015).  In this case, the alleged violation is Northeast's failure to provide accurate notice of the overdraft service in the Opt In Agreement.  An injury occurs when an overdraft fee is assessed based on allegedly misleading notice.  Walbridge has not shown that it was necessary for Northeast to charge a series of overdraft fees to cause an injury.  Therefore, the continuing violation theory does not apply in this case.  See Whittington v. Mobiloil Fed. Credit Union, 2017 WL 6988193, at *13 (Sept. 14, 2017).

v. Native Commerce Studios, LLC, 2018 WL 447716, at *1-*2 (W.D. Mich. Jan. 17, 2018) (citing and discussing cases); Whittington, 2017 WL6988193, at *2-*4 (citing and discussing cases); Harvey v. Google, 2015 WL 9268125, at *3-*4 (N.D. Calif. Dec. 21, 2015) (citing and discussing cases).  As a result, recurrent or subsequent transfers and fees do not constitute separate occurrences that are independently actionable.  Wheeler, 2018 WL 447716, at *1 (citing cases); Abrantes v. Fitness 19 LLC, 2017 WL 4075576, at *5 (E.D. Calif. Sept. 14, 2017) (citing cases); Whittington, 2017 WL 6988193, at *13 (citing cases).

Walbridge relies on Diviacchi v. Affinion Gr., Inc., 2015 WL 3631605, at *5-*10 (D. Mass. Mar. 11, 2015), (report and recommendation adopted, 2015 WL 3633522 (D. Mass. June 4, 2015)).  In Diviacchi, the court recognized that the claimed violation occurred through an allegedly invalid authorization but then concluded that each recurring transfer was an independently actionable harm.  Id. at 10.  That conclusion does not comport with the language of § 1693m(g) or the circumstances of the alleged violation, as is more thoroughly explained in the cases cited above.  For that reason, Diviaccchi is not persuasive.  See Harvey, 2015 WL 9268125, at *4, n.1

Therefore, the first assessment of an overdraft fee in Walbridge's account, which occurred in March of 2016, triggered

the one-year limitations period.  The complaint was not filed
until September of 2017, more than a year later.  As a result,
the claim was filed outside the limitations period.

### ii.  Discovery Rule

Walbridge contends that his EFTA claim cannot be dismissed
as untimely without an opportunity for him to develop facts to
show that he did not discover the violation until less than a
year before he filed suit.[10]  In support, Walbridge argues only
that Northeast did not disclose that it was using the available
balance method to assess overdraft fees in the Agreements.  He
provides no basis to show that facts exist to apply the
discovery rule.

For purposes of federal claims generally, the "discovery
rule allows a claim to accrue when the litigant first knows or
with due diligence should know facts that will form the basis

---

[10] Although Walbridge also mentions equitable tolling in
passing, he provides no developed argument to support that
theory.  "[E]quitable tolling is a rare remedy to be applied in
unusual circumstances, not a cure-all for an entirely common
state of affairs."  Neves v. Holder, 613 F.3d 30, 36 (1st Cir.
2010) (internal quotation marks omitted).  To invoke the
protection of equitable tolling, the plaintiff bears the burden
of showing both that he diligently pursued his rights and "some
extraordinary circumstance stood in his way."  Id.  Walbridge
provides neither showing, and his perfunctory reference to
equitable tolling is insufficient to invoke its protection.  See
Dimott v. United States, --- F.3d ---, 2018 WL 671115, at *10
(1st Cir. Feb. 2, 2018); Higgins v. New Balance Ath. Shoe, Inc.,
194 F.3d 252, 260 (1st Cir. 1999).

for an action." Randall v. Laconia, N.H., 679 F.3d 1, 7 (1st
Cir. 2012) (internal quotation marks omitted).  The discovery
rule is based on an objective standard, requiring that "the
factual basis for the cause of action must have been inherently
unknowable that is, not capable of detection through the
exercise of reasonable diligence at the time of injury."
Sanchez v. United States, 740 F.3d 47, 52 (1st Cir. 2014)
(internal quotation marks omitted).  In the context of EFTA
claims, courts have found that the discovery rule does not apply
because a plaintiff could reasonably discover an injury by
reviewing his bank statement or online account which would show
that a fee or fees had been improperly assessed.  Whittington,
2017 WL 6988193, at *13 (citing cases)"BO.

    "The district court may grant a motion to dismiss based on
a defendant's affirmative defense of a statute of limitations
when the pleader's allegations leave no doubt that an asserted
claim is time-barred."  DeGrandis v. Children's Hosp. Boston,
806 F.3d 13, 16 (1st Cir. 2015) (internal quotation marks
omitted).  Based on Walbridge's allegations in his complaint,
Northeast assessed overdraft fees of $32.00 on March 15, 29, and
30, 2016, when he had money in his account to cover the
transactions.  Walbridge does not explain why he could not have
discovered that those fees were improperly charged until after

September 19, 2016.  Therefore, Walbridge's allegations, even in light of the discovery rule, leave no doubt that his Regulation E claim is time barred.

## Conclusion

For the foregoing reasons, the defendant's motion to dismiss (document no. 8) is granted as to Claim 4 (unjust enrichment and restitution), Claim 5 (money had and received), and Claim 6 (violation of EFTA).  The motion is otherwise denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

March 7, 2018

cc:   Christine M. Craig, Esq.
      Andrew J. Demko, Esq.
      Russell F. Hilliard, Esq.
      Tara Kick, Esq.
      Jae K. Kim, Esq.
      Brook Louis Lovett Shilo, Esq.
      Richard D. McCune, Esq.
      Sean T. O'Connell, Esq.
      Stuart M. Richter, Esq.